UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| KENTUCKY LODGE NO. 681, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br><br> DYLAN ANDERSON and COOK COMPRESSION, <br><br> Defendants. <br> ———————————————— <br> DYLAN ANDERSON, <br><br> Cross Claimant, <br><br> v. <br><br> COOK COMPRESSION, <br><br> Cross Defendant. | No. 4:21-cv-00066-JMS-KMB |

## <u>ORDER</u>

This case concerns the arbitrability of Defendant Dylan Anderson's termination of employment by Co-Defendant Cook Compression ("Cook"). Mr. Anderson was terminated because of fallout that occurred after he engaged in controversial off-duty activity—recruiting persons to join the American Nazi Party while donning Nazi insignia and distributing its literature. Cook and Plaintiff Kentucky Lodge No. 681 of the International Association of Machinists and Aerospace Workers, AFL-CIO ("Lodge 681") were parties to a collective bargaining agreement ("CBA"), which required Lodge 681 to represent Cook employees, including Mr. Anderson, for grievances covered by the terms and conditions of the CBA. Mr. Anderson's termination resulted

in the filing of a grievance, but after informal resolution was not successful, Cook refused Lodge 681's demand to arbitrate the grievance.  Lodge 681 was not sure it wanted to pursue litigation compelling Cook to arbitrate because it came to believe the termination may implicate "matters beyond the scope of the CBA," but it also was concerned about fulfilling its duty to fairly represent the members of the bargaining unit, including Mr. Anderson.

Consequently, Lodge 681 chose to file this action pursuant to Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185.  Its Complaint seeks a declaration that Mr. Anderson's termination is "not arbitrable under the CBA" or, alternatively, an order "requiring arbitration" of the matter.  [Filing No. 1 at 6.]  Presently before the Court is Lodge 681's Motion for Summary Judgment, which asks the Court to find that Mr. Anderson's grievance is not arbitrable under the terms of the CBA.  [Filing No. 76; Filing No. 77 at 8.]  Lodge 681's Motion has been fully briefed, [Filing No. 77; Filing No. 79; Filing No. 81; Filing No. 82], and is ripe for the Court's review.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e). And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.* The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir.

2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.   Mr. Anderson's Employment by Cook

Mr. Anderson is a former machinist at Cook's Jeffersonville, Indiana facility. [Filing No. 76-1 at 1.] Lodge 681 and Cook are parties to a CBA, under which Cook has recognized Lodge 681 as the "sole and exclusive representative" of the bargaining unit consisting of machinists and other production employees. [Filing No. 76-6 at 3.] Mr. Anderson was a member of the bargaining unit. [Filing No. 76-5 at 1.]

### B.   The CBA

Under Article III of the CBA, the "Management" clause, the management of Cook's plant facility and the direction of the work force is "vested exclusively in the Company, including the right to discharge an employee "for proper cause." [Filing No. 76-6 at 6.] The Management clause further provides that the "methods of exercising" Cook's prerogatives within the Agreement "shall be in accordance with the terms of the Agreement." [Filing No. 76-6 at 6.]

Article VIII of the CBA, titled "Discharge," provides that an employee's discharge from employment "shall constitute a case arising under the method of adjusting grievances" if the employee believes "that he has been unjustly dealt with." [Filing No. 76-6 at 19.] In turn, a five-

4

step Grievance Procedure for resolving disputes covered by the CBA is described at Article VII,

which provides as follows:

- At Step One, if an employee covered by the CBA "believe[s] that he has been unjustly dealt with or discriminated against in any manner whatsoever," that employee will tell his supervisor that he wishes to meet with his committee person, meaning his union representative. Thereafter, the employee, committee person, and company supervisor will attempt to resolve the matter and if they cannot do so expeditiously and within certain deadlines, the matter will be raised with company management through a written grievance. [Filing No. 76-6 at 16.]

- At Step Two, the employee, Lodge 681 representatives, and a Cook representative will "promptly meet with the view of effecting a settlement." [Filing No. 76-6 at 17.] If no settlement can be reached, "either party" may move to Step Three. [Filing No. 76-6 at 17.]

- At Step Three, the parties may "mutually agree to mediate" the grievance. [Filing No. 76-6 at 17.] "If mediation is rejected by either party, then either party may move to arbitrate [the] grievance." [Filing No. 76-6 at 17.]

- At Step Four the parties may choose binding mediation rather than "traditional arbitration" [Filing No. 76-6 at 17], but if "either party" rejects such mediation, then the grievance is "moved" to Step Five, [Filing No. 76-6 at 17].

- At Step Five, "the party requesting arbitration" must notify the other party in writing of its desire for arbitration, which triggers obligations by the "two parties" to schedule a meeting to draft a joint letter to the Director of Federal Mediation and Conciliation Service that requests the selection of a panel of arbitrators. From that panel, "the parties" use a striking process to select the arbitrator, and the time of the arbitration "shall be mutually agreed upon by both parties" but shall take place as "speedy" as possible. [Filing No. 76-6 at 17-18.]

## C.     Mr. Anderson's American Nazi Party Activities

Mr. Anderson is a member of the American Nazi Party (the "ANP"), which he describes

as a "nonviolent separatist" group. [Filing No. 76-2 at 18.] During a non-workday, Mr. Anderson

and another individual set up a booth at the Clark County Forestry in Clark County, Indiana ("the

Forestry"), to distribute ANP literature and recruit members of the public to join the ANP. [Filing

No. 76-1 at 1; Filing No. 76-2 at 2; Filing No. 81-1 at 1.] Mr. Anderson and his fellow ANP

member were both wearing clothing bearing swastikas, [Filing No. 76-2 at 14-16], and some of

the literature they handed out included caricatures of Jewish people, offensive slurs for both Jewish and Black people, and images of Adolph Hitler, [Filing No. 81-3; Filing No. 81-7; Filing No. 81-11]. Some of the literature denounced alleged unfairness to "America's White Working Class" and asked persons to "Join the Fight Now!" or to "Be Part of the Solution" and "secure the existence of our people and a future for white children." [Filing No. 81-4; Filing No. 81-9.]

While Mr. Anderson and his fellow ANP member were engaged in their ANP-touting activities—distributing literature and discussing their ANP beliefs—several members of the public voiced their opposition, and some demanded that Mr. Anderson and his friend leave the Forestry, but no violence ever occurred. [Filing No. 81-1 at 1-2; Filing No. 81-14 at 5.] At one point, an Indiana Conservation Officer and a Clark County Police officer arrived on the scene and informed those present that Mr. Anderson "had a right to [his] beliefs and to share those [beliefs] on public property." [Filing No. 81-1 at 1-2.] Mr. Anderson's literature distribution and advocacy and the controversy that arose with some members of the public drew media attention. He had one media interview about his beliefs and activities at the Forestry, and the matter garnered local and some national attention. [Filing No. 81-1 at 2; Filing No. 81-14.]

### D. Cook Received Complaints About Mr. Anderson

On the same day Mr. Anderson was at the Forestry touting the ANP, the Cook Jeffersonville Plant Manager, Carla Manning, received a text message from another Cook employee regarding media coverage of Mr. Anderson's ANP activities. That employee "asked to remain anonymous for his safety and that of his family," and Ms. Manning "became concerned about employee safety and disruptions at the plant." [Filing No. 76-1 at 1.] The following day (a Sunday), Ms. Manning spoke to Mr. Anderson and asked "if the reports were correct," and he said,

6

"I'm not going to lie - yes it was me." [Filing No. 76-1 at 2.] He also told Ms. Manning that she should "check out the [ANP] website." [Filing No. 76-1 at 2.]

Over the next two days—August 10 and 11, 2020—Cook management personnel: (a) became aware of Facebook postings and anonymous calls to Cook's compliance hotline that expressed outrage about Mr. Anderson's activities or about the fact that Cook employed him, or both; (b) read an online article published by Newsweek regarding Mr. Anderson's activities at the Forestry; and (c) received anonymous calls by employees who "expressed their fear of reporting to work." [Filing No. 76-1 at 2; Filing No. 76-2 at 17-19; Filing No. 76-2 at 20-28.] Additionally, on Monday, August 10, "several employees called off work in fear that Nazis would show up" at the plant. [Filing No. 76-4 at 1.]

### E. Mr. Anderson's Termination and Cook's Refusal to Arbitrate

Cook terminated Mr. Anderson's employment on August 11, 2020, on the grounds that his activities at the Forestry on August 8—wearing Nazi paraphernalia and "distributing material that is anti-Semitic and culturally insensitive," which garnered local and national media coverage—violated Cook's Code of Business Conduct & Ethics and provided grounds for discharge under the CBA. [Filing No. 76-3 at 1-2.] Cook cited a Code provision that "prohibit[s] behaviors that create an [i]ntimidating, harassing or offensive environment to employees," and a provision of the CBA listing the following actions as constituting a typical ground for discharge: "Discharge #13: Gross or habitual carelessness or recklessness, playing tricks, jokes, or other dangerous pranks on other employees, or other disregard for safety or comfort of fellow workers." [Filing No. 76-5 at 2.]

Mr. Anderson submitted a grievance regarding his termination.[1] [Filing No. 81-13.] Cook and Lodge 681 then met regarding Mr. Anderson's grievance and completed the first three steps of the CBA's grievance process. [Filing No. 76-1 at 2.] Lodge 681 then demanded arbitration, but Cook refused to arbitrate. [Filing No. 76-5 at 2.] Later, for various reasons related to concerns about potential effects on safety in the workplace, Lodge 681 "ultimately decided" that "demanding arbitration was the wrong decision." [Filing No. 76-5 at 2.] It did not, however, withdraw its arbitration demand because it was "unsure how that would impact [its] duty to [Mr.] Anderson, and decided to file this lawsuit instead to get the Court's guidance." [Filing No. 76-5 at 2.]

**F.     This Lawsuit**

The positions of Lodge 681 and Cook about their willingness to arbitrate Mr. Anderson's grievance have completely flip-flopped over the course of this litigation.  Lodge 681's April 23, 2021, Complaint for Declaratory Relief asserts that while it "agrees with Cook that this matter implicates matters beyond the scope of the CBA," it also has a "duty to fairly represent members of the bargaining unit, including Mr. Anderson, involving issues arising pursuant to the CBA." [Filing No. 1 at 4.] Accordingly, Lodge 681 requested that the Court either determine that Cook's termination of Mr. Anderson is beyond the scope of the CBA, and thus not subject to arbitration, or "compel Cook to arbitrate [Mr.] Anderson's discharge grievance." [Filing No. 1 at 6.] Cook subsequently filed its Answer, wherein it "admitted" Lodge 681's interpretation of the CBA, but "disagrees" with Lodge 681's alternative request that the Court order Cook to arbitrate. [Filing

---

[1] Mr. Anderson has filed a copy of his grievance form as part of his designated evidence, [Filing No. 81-13], but as his counsel has acknowledged, the document quality is extremely poor, [Filing No. 81 at 6]. The Court cannot read much of its contents, but no one disputes that Mr. Anderson filed a grievance protesting his termination.

No. 8 at 2.] In his Answer, Mr. Anderson denied that the bases for his termination took it outside coverage under the CBA. [Filing No. 28 at 4, ¶ 32.]

Mr. Anderson filed a cross-claim and then an amended cross-claim against Cook, seeking declaratory relief that his off-duty conduct did not constitute grounds for termination and Cook is required to participate in arbitrating his grievance. [Filing No. 39; Filing No. 63 at 3.] About one month after answering the amended cross-claim and denying that Mr. Anderson had any right to relief, [Filing No. 65 at 3], Cook filed an Offer of Judgment on May 20, 2022, directed to both Lodge 681 and Mr. Anderson, now offering to arbitrate Mr. Anderson's grievance—a remedy each of those parties has sought in the litigation, [Filing No. 67]. Mr. Anderson states that he accepted Cook's Offer of Judgment, but Lodge 681 did not. [Filing No. 81 at 3.] Lodge 681's motion for summary judgment confirms that it did not accept Cook's offer to arbitrate. Instead, in its own about-face from its earlier litigation position, Lodge 681 now urges the Court to find that it cannot order arbitration of Mr. Anderson's grievance in part because neither it nor Cook wants to arbitrate. [Filing No. 77 at 5.]

## III.
### DISCUSSION

Lodge 681 argues that Mr. Anderson's grievance is not arbitrable under the terms of the CBA for two reasons. [Filing No. 77 at 5-11.] First, Lodge 681 argues that because Cook and Lodge 681 currently "agree, as they do, that the matter should not be arbitrated" and Mr. Anderson lacks standing to compel them to arbitrate, the Court must find as a matter of law that Mr. Anderson's termination is not arbitrable. [Filing No. 77 at 9.] Second, Lodge 681 urges a public policy basis for interpreting the CBA not to require arbitration of Mr. Anderson's employment discharge. Lodge 681 asserts that interpreting the CBA to require arbitration "would run afoul of long-settled federal labor policy, and the contract language should be interpreted to avoid such a

conflict." [Filing No. 77 at 5.]  It argues that while federal labor policy favors the arbitration of labor disputes, it also favors "the elimination of political strife and subversive political elements from labor-management relations." [Filing No. 77 at 9.]  Lodge 681 contends that often these policies "work in tandem to promote industrial peace," but this case presents a "rare situation" in which these policies conflict because Mr. Anderson's "beliefs run afoul of the framework of federal civil rights legislation aimed at equalizing employment opportunities for all citizens regardless of race, religion or national origin" and, therefore, arbitrating his termination "raises the possibility of his reinstatement at the Cook plant and the return of those subversive ideals [sic] to the production floor, which would undermine industrial stabilization and labor-management peace at the Cook facility." [Filing No. 77 at 10.]

Cook submitted a one-sentence Response, which states that it "believes [Lodge 681's] Motion for Summary Judgment has merit and that [Lodge 681] is entitled to the Judgment it seeks." [Filing No. 79.]

Mr. Anderson separately filed a Response, in which he argues that Lodge 681 is not entitled to summary judgment because there are two genuine material facts in dispute: (1) whether Lodge 681 would "negotiate and accept a CBA that allows [Cook] to terminate a union member for exercising a fundamental constitutional right, i.e., his right to free speech"; and (2) whether he "advocated for a segregated workplace, extermination of the Jews or violence against the United States government." [Filing No. 81 at 4-5.]  Mr. Anderson argues that Lodge 681 "ignores the strong protection given to an individual's fundamental right to free speech" and is "essentially asking this Court to find that the Union negotiated and accepted a CBA that allows [Cook] to police union members' off-duty, protected speech and terminate any union member who it found expressed beliefs outside the workplace, that [Cook] found unpopular." [Filing No. 81 at 4.]  Mr.

Anderson argues that allowing Lodge 681 to "abdicate its responsibility to fairly and diligently represent [him] because of his unpopular, off-duty speech would do exactly what the U.S. Supreme Court said cannot be done to the First Amendment: turn it into a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" [Filling No. 81 at 4-5 (emphasis and internal citation removed).] Additionally, Mr. Anderson argues that there is nothing in his "statements to the media nor in the literature he distributed" nor Lodge 681's designated evidence to support Lodge 681's contention that he "holds the unabashed view in racially segregated workplaces and the extermination of the Jews." [Filing No. 81 at 5 (citing Filing No. 77 at 1) (emphasis omitted).]

Lodge 681 replies that Mr. Anderson's alleged genuine issues of material fact in dispute are actually legal argument rather than "a counter-statement of factual allegations." [Filing No. 82 at 2.] Additionally, Lodge 681 argues that it is "not a state actor and therefore owes [Mr.] Anderson no duty in relation to his Constitutional rights." [Filing No. 82 at 2.] Lodge 681 argues that Mr. Anderson points to "no provision in the CBA" that would make it "a guarantor of [his] constitutional rights, especially where [Mr.] Anderson's exercise of his rights actually undermines federal labor policy and directly conflicts with [Lodge 681's] contractual obligations" to Cook and other Lodge 681 members. [Filing No. 82 at 2.]

The Court will address Mr. Anderson's alleged genuine issues of material fact in conjunction with its analysis of Lodge 681's two arguments about why the Court should declare that Mr. Anderson's grievance is not arbitrable as a matter of law.

### A.    The Parties' Obligations and Arbitrability under the CBA

Both of Lodge 681's arguments regarding arbitrability require a review of pertinent provisions of the CBA. To determine arbitrability, the Court must determine whether the dispute

is "on its face" governed by the CBA's arbitration provision. *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. TriMas Corp.*, 531 F.3d 531, 535 (7th Cir. 2008). To do this, courts look to the plain meaning of the arbitration provision, striving to avoid absurd results, and resolving any doubts in favor of arbitration. *Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.*, 491 F.3d 685, 688 (7th Cir. 2007) (citation omitted); *see also Karl Schmidt Unisia, Inc. v. Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am., UAW Local 2357*, 628 F.3d 909, 913 (7th Cir. 2010) ("The language of the CBA's arbitration clause forms the basis of our analysis.").

Because arbitration is "a matter of contract," a party to a CBA "cannot be required to submit to arbitration any dispute which he has not agreed [under the contract] so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am*., 475 U.S. 643, 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co*., 363 U.S. 574 (1960)). However, the Supreme Court has emphasized that both law and public policy strongly favor arbitration. *Gateway Coal Co. v. United Mine Workers of Am.*, 414 U.S. 368, 378–79 (1974); *Int'l Bhd. of Elec. Workers Local 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014). Accordingly, the Court must find that a matter is arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steel*, 531 F.3d at 535 (quoting *Warrior & Gulf*, 363 U.S. at 582–83).

Here, Mr. Anderson's grievance about his termination would under ordinary circumstances be declared arbitrable under the language of the CBA. First, Article VIII titled "Discharge" states in plain terms that an employee's discharge from employment "*shall* constitute a case arising under the method of adjusting grievances" if the employee believes "that he has been unjustly dealt with." [Filing No. 76-6 at 19; emphasis added.] Second, the Grievance Procedure under Article VII

12

similarly provides that it is invokable by an employee who believes "that he has been unjustly dealt with or discriminated against in any manner whatsoever." [Filing No. 76-6 at 16.] Under Steps One through Three of the Grievance Procedure, Lodge 681 and Cook have a "duty" to attempt to resolve an employee's grievance informally. [Filing No. 76-6 at 16-17.] If this is unsuccessful, the "parties may mutually agree to mediate such grievance" under Step Four or "either party may move to arbitrate" under Step Five. [Filing No. 76-6 at 16-17.] It is undisputed that Mr. Anderson invoked Step One of the Grievance Procedure and his grievance over employment termination was reduced to writing and provided to Cook. [Filing No. 81-13.] It is also undisputed that an informal resolution of his grievance, involving both Lodge 681 and Cook, via Steps One through Three also occurred but did not result in a resolution. [Filing No. 76-5 at 2.] And it is undisputed that Lodge 681 initially demanded arbitration, but Cook then refused to arbitrate Mr. Anderson's grievance. [Filing No. 76-5 at 2.]

**B.     Whether the Dispute Must Be Arbitrated**

Despite the plain language in Articles VII and VIII of the CBA recited above, the Court finds that Lodge 681 and Cook are not now required to arbitrate. As explained below, its conclusion is based on the fact that neither Lodge 681 nor Cook now wants to arbitrate. The Court's decision is not grounded in Lodge 681's general labor policy-based arguments, which the Court does not accept as bases for ignoring the plain language of the CBA's arbitration provision.

*1.   The Effect of the Parties' Unwillingness to Arbitrate*

While the CBA's Grievance Procedure contemplates a role for aggrieved employees as part of the informal grievance process under Steps One through Three, the mediation and arbitration procedures under Steps Four and Five are described as involving just "the parties," the "two parties," or "both parties." [Filing No. 76-6 at 17-18.] Lodge 681 asserts that these references to

13

"the parties" and other references throughout the CBA to "parties" mean only the parties to the CBA, which are Local 681 and Cook, but not Mr. Anderson. [Filing No. 77 at 9.] The Court agrees with Lodge 681 that the term "party" is used throughout the CBA in reference to Cook or Lodge 681, but not in reference to members of the collective bargaining unit, who are referred to as "employees." [*See, e.g.,* Filing No. 76-6 at 3; Filing No. 76-6 at 23-24; Filing No. 76-6 at 48-51.] Moreover, the arbitration protocols described in Step Five of the Grievance Procedure even more pointedly reference the "two parties" and "both parties" in addressing the Union's and the Company's obligations to draft a joint letter requesting a panel of arbitrators and to schedule arbitration in a timely manner. [Filing No. 76-6 at 18.]

Mr. Anderson has not contested Lodge 681's assertions, does not claim to be a party to the CBA, and has not asserted that he has a right to demand arbitration under the CBA. [Filing No. 81.] While Lodge 681 and Cook have flip-flopped over time on their positions about willingness to arbitrate, neither Lodge 681 nor Cook is now demanding that the other arbitrate. In fact, neither one of them wants to arbitrate. Lodge 681's summary judgment brief states in clear terms that "neither party [to the CBA] seeks arbitration of Anderson's termination," [Filing No. 77 at 5], and Cook's Response to that filing informed the Court of its view that Lodge 681's summary judgment motion "has merit and . . . and Lodge 681" is entitled to the Judgment it seeks." [Filing No. 79.] The Court has fairly interpreted this statement as Cook's agreement with Lodge 681's assertion that Cook does not seek arbitration, even though Cook earlier made a (now-withdrawn) Rule 68 Offer of Judgment to arbitrate. [Filing No. 67.][2]

---

[2]     As noted in this Order, *supra* at 9, Mr. Anderson accepted Cook's offer, but Lodge 681 did not. Under Fed. R. Civ. P. 68, if an Offer of Judgment is not accepted within 14 days of its service, it is considered withdrawn.

Because the only parties to the CBA do not want to arbitrate Mr. Anderson's termination, there is no basis for this Court to order them to do so. If one of them did, Mr. Anderson's unresolved grievance about having been unjustly discharged from employment would be a matter within the plain language of the CBA's arbitration provision.

The Court now turns to Lodge 681's second, public policy-based argument about why the Court should find that Mr. Anderson's grievance over his termination is not arbitrable.

### 2. Whether Public Policy Concerns Override the CBA's Plain Terms

The primary focus of Lodge 681's summary judgment motion regarding arbitrability is its public policy-based argument. Lodge 681 urges the Court to find that "interpreting" Article VII's Steps One through Five Grievance Procedure as requiring arbitration of Mr. Anderson's termination "would run afoul of long-settled federal labor policy" and should therefore be "interpreted to avoid such a conflict" via a judicial finding that Mr. Anderson's particular termination is not arbitrable. [Filing No. 77 at 5 and 10-11.] It is in response to this public policy argument that Mr. Anderson has suggested that genuine issues of material fact prevent the grant of summary judgment.

Lodge 681's argument rests on the odious nature of Mr. Anderson's Naziism, his membership in the American Nazi Party, and his public activities at the Forestry (including touting certain tenets of the ANP, wearing clothing bearing swastikas, trying to recruit persons to join the ANP, and distributing ANP literature that included images of Adolph Hitler, anti-Semitic caricatures of Jewish people, and hostile and offensive slurs for both Jewish and Black people). Lodge 681 also emphasizes evidence regarding how Mr. Anderson's activities at the Forestry, and the local and national media attention they garnered, affected the workplace, citing to an affidavit by Cook's plant manager (Ms. Manning) which describes Cook's receipt of calls and other

communications from employees and the general public expressing concerns about Mr. Anderson's continued employment at the Cook plant.  [Filing No. 76-1 at 2; Filing No. 77 at 3.]  Further, Lodge 681 points to a minority demographic at the Cook plant, stating that the bargaining unit members are "pretty diverse" and "about 25% of its members are African-American."  [Filing No. 76-5 at 1.]  In response, Mr. Anderson contests that his activities at the Forestry were not as odious as Lodge 681 makes them out to be, though he agrees that his beliefs are "extremely unpopular." [Filing No. 81 at 5.]  Moreover, he disputes whether his activities or beliefs should be deemed to affect the workplace in a manner justifying his termination because he has never called for a racially segregated workplace, or the genocide of Jewish persons, and did not advocate for any violence.  [Filing No. 81 at 5.]

As explained below, the Court finds the parties' differences about the scope of Mr. Anderson's Nazi beliefs or the potential effects of his beliefs on the workplace immaterial to its decision on Lodge 681's public policy-based contract interpretation argument.  The Court can accept both Lodge 681's and Mr. Anderson's views of the evidence because their views—even if the Court were to agree with Lodge 681 that Mr. Anderson's termination was likely for proper cause—do not affect the Court's interpretation of the CBA.

Simply, Lodge 681 has not cited a single authority allowing this Court to ignore the plain and unambiguous terms of an arbitration provision that includes employee termination within its scope so long as the Court agrees that a particular employee's termination was based on conduct and a belief-system that is sufficiently odious to society in general and a workplace in particular. Instead, Lodge 681 relies on an old statute (but one found unconstitutional nearly 60 years ago) and a provision of the CBA that binds Lodge 681 and Cook.

The old statute, 29 U.S.C. § 504, was originally passed by Congress in 1959 and made it a crime for a member of the Communist Party to serve as an officer or employee of a labor union. Lodge 681 interprets the existence of this statutory provision as evidence of Congress's "careful [exclusion] from the mandates of collective bargaining those activities undertaken by workers which are antithetical to national security and the peaceful resolution of industrial conflict," [Filing No. 77 at 9], but the statute says nothing like that, and Lodge 681 supplies no authority to support its interpretation.  In fact, when the Supreme Court examined this statutory exclusion of members of the Communist Party in 1965, the Court found it unconstitutional even while noting that the apparent purpose of Congress's prohibition in 29 U.S.C. § 504 was to exclude from union positions those persons who were thought to be peculiarly capable of instigating labor strife. *See United States v. Brown,* 381 U.S. 437 (1965).  This old statute says nothing about mere bargaining unit members or any implicit right to exclude any such employee's grievance from otherwise applicable arbitration provisions based on the nature of the conduct that led to his termination.

Lodge 681's other "authority" for the suggestion that the Court can ignore the plain language of an arbitration clause and find Mr. Anderson's termination non-arbitrable as a matter of "interpreting" the CBA otherwise does not help its argument either.  It points to the CBA's Anti-Discrimination Clause, under which Lodge 681 and Cook "recognize their responsibilities" under federal and state civil rights and fair employment laws and related Constitutional or statutory requirements and affirm their commitment "not to discriminate based on race, sex, color, creed, national origin or ancestry." [Filing No. 77 at 8; Filing No. 76-6 at 46-47.]  Nothing within this language is connected to whether a bargaining unit member's grievance is within the CBA's scope of arbitration, nor does Lodge 681 cite any authority that an arbitration clause can be ignored if a union or employer believes the employee's discharge from employment was fully justified by his

touting of ugly Nazi creeds or his membership in an organization antithetical to social good.  *See Int'l Bhd. of Elec. Workers Local 2150,* 762 F.3d at 596 (without an explicit exclusion from arbitration in the CBA of a particular cause of an employee's termination, a court must not "contravene the [plain] language of the agreement").

The Court also rejects Mr. Anderson's counter-argument that the Court should not interpret the CBA based on the public policy arguments put forth by Lodge 681 because there are even more important public policy considerations that sway the other way.  Mr. Anderson references his free speech rights under the First Amendment, asserts that his actions at the Forestry and his ANP beliefs constituted "peaceful, lawful, and off-duty public speech," and urges the Court not to accept an interpretation of the CBA that would allow a union not to protect a bargaining unit member from arbitrary treatment by the employer because of his "unpopular, off-duty speech."  [Filing No. 81 at 4.]  But just like the Court's rejection of Lodge 681's invitation for it to ignore plain contractual language in favor of public policy choices, the Court similarly rejects Mr. Anderson's suggestion that the First Amendment has anything to do with how the Court should apply plain private contract language in the CBA.  Further, to the extent Mr. Anderson's arguments opposing summary judgment are based on any theory that he has First Amendment rights assertable against Lodge 681 or Cook, those arguments are rejected too.  It is a very basic principle of law that the Free Speech Clause of the First Amendment prohibits abridgement of speech only by government actors and not private actors. *Manhattan Cmty. Access Corp. v. Halleck,* 139 S. Ct. 1921, 1928 (2019).  Neither Lodge 681 nor Cook is a government actor and there is no indication either possibly could be deemed a "state actor." *Id.* at 1928-29 (addressing the limited circumstances under which a private entity can qualify as a state actor found subject to the constraints of the First Amendment).

In short, the Court wholly rejects Lodge 681's contention that the plain language of the CBA's arbitration provision can be rendered a nullity or interpreted in a manner contrary to its terms so long as the Court is satisfied there are good public policy reasons to do so. Nothing in the CBA allows this Court to ignore the arbitrability language within the Discharge and Grievance Procedure provisions (Articles VII and VIII) because Cook and Lodge 681 believe generally that the discharge of a particular employee serves a general purpose of maintaining a stable work environment for the greatest good of employees.

## C.      Scope of the Court's Decision

The Court finds it necessary to comment generally about the parties' competing summary judgment arguments, particularly their conflicting positions about the most reasonable way to view Mr. Anderson's activities at the Forestry and whether his activities, or others' perceptions of them, had a deleterious effect on the workplace sufficient to support Cook's termination of his employment. Except for the Court's need to describe the parties' contentions in order to address Lodge 681's argument that the Court should find Mr. Anderson's termination not arbitrable based on general policy concerns, none of this evidence was relevant to arbitrability. Instead, it all goes to the merits about whether Cook had proper cause to terminate Mr. Anderson. But as Lodge 681 knows from the very authority it cited in its brief, when a court decides whether a grievance is within the scope of a CBA's arbitration clause, it must refrain from addressing the merits of the grievance, whether it finds a decision on the merits to be easy or difficult. *E.M. Diagnostic Systems, Inc. v. Local 169, Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 812 F.2d 91, 97 (3d Cir. 1987). Decisions on the merits are for an arbitrator. *Id.; see also United Steel,* 531 F.3d at 536 (7th Cir. 2008) (in deciding question of arbitrability, court does not "weigh in on the merits" "unless absolutely necessary");

19

*Int'l Bhd. of Elec. Workers, Local 21 v. Illinois Bell Tel. Co.,* 491 F.3d 685, 688 (7th Cir. 2007) ("When determining whether the parties have agreed to arbitration, a court must be careful not to consider the merits of the underlying claim.")

There are some circumstances in which the merits of a grievance must be addressed by a court but not in the context of determining arbitrability. For example, if a court is examining (1) whether a union breached a duty of fair representation in connection with its arbitration of (or declination to arbitrate) a grievance and/or (2) whether an employer's actions against a bargaining unit member were in breach of the CBA, the merits can—of course—be important. *See, e.g., Crider v. Spectrulite Consortium, Inc.,* 130 F.3d 1238, 1241-42 (7th Cir. 1997).

The Court must emphasize that Lodge 681's motion for summary judgment did not raise the issue of whether it breached a duty of fair representation. That issue is not before the Court. Lodge 681 has not asked the Court, even inferentially, to decide a claim of whether it breached a duty of fair representation, and Mr. Anderson has never brought a counterclaim against Lodge 681. Mr. Anderson's statement in paragraph 10 of his Statement of Claims and Defenses, [Filing No. 56], that Lodge 681's failure to object to Cook's "Motion for Judgment on the Pleadings was a failure to adequately represent him" does not constitute a counterclaim by him against Lodge 681. *See Sturm v. City of Indianapolis,* 2016 WL 2894434 at *12 (S.D. Ind. May 18, 2016) (the statement of claims required by the case management order is not a pleading and it cannot be used to amend a pleading). The Court also emphasizes that it has not decided Mr. Anderson's amended cross-claim against Cook—the merits of that claim were not before the Court on the present motion.

## IV.
### CONCLUSION

For the reasons discussed above, the Court **GRANTS** Lodge 681's Motion for Summary Judgment, [76]**.** The Court will not compel Lodge 681 or Cook to arbitrate Mr. Anderson's grievance because neither Lodge 681 or Cook agrees to arbitrate.  Because Mr. Anderson's amended cross-claim remains pending, no final judgment shall issue at this time.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable regarding resolution of the amended cross-claim short of trial.


November 8, 2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Distribution:**

Counsel of record electronically registered

Magistrate Judge Kellie M. Barr